**UNITED STATES v. MIRO.**

No. 455.

Circuit Court of Appeals, Second Circuit.
July 5, 1932.

J. Richard Davis, of New York City, for appellant.

George Z. Medalie, U. S. Atty., of New York City (Thomas E. Dewey, Murray I. Gurfein, and Livingston Hall, Asst. U. S. Attys., all of New York City, of counsel), for the United States.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

This appeal is from a conviction and sentence for violation of the income tax laws. Section 146 (a, b), Revenue Act of 1928, section 2146 (a, b), title 26, U. S. C. (26 USCA § 2146 (a, b). Counts 1, 2, and 3 charge a willful attempt to evade and defeat income taxes for the years 1928, 1929, 1930, section 146 (b); counts 4, 5, and 6 for willful failure to file income tax returns for 1928, 1929, and 1930, section 146 (a).

It was charged in counts 1, 2, and 3, and proved at the trial, that the appellant's taxable income in 1928, 1929, and 1930 was, respectively, $34,965.97; $46,103.02, and $86,963.07. As to counts 4, 5, and 6, it was charged that the appellant had a gross income in excess of $5,000 and a net income in excess of $3,900 for each of these years. The sentence imposed was three years on each of the felony counts, to run concurrently, and to imprisonment for one year and a fine of $5,000 on each of the three misdemeanor counts, the same to run consecutively after the three-year sentence, provided, however, that a commutation of the jail sentence on all of the one-year terms is to be procured if the three-year term is served. Therefore, on the affirmance of this conviction, the appellant will serve the three-year term only.

The appellant concedes that he did not file an income tax return or pay a tax for any of these years, and that he lived within the Southern district of New York. He had a wife and one child, and was entitled to an exemption of $3,900.

Prior to the years in question, the appellant was a stoker on a steamship. In 1927, he became established as a banker in gambling, running a policy or number game in New York City. The game consists of bet-

ting small sums upon three certain digits in the daily reports of the New York Clearing House. The bets range from a penny to a dollar. Each business day during the years in question, in the morning, the Clearing House would post two figures, one showing the total bank clearings for the preceding day and the other showing the Clearing House balance on hand at the end of each day. The afternoon newspapers published in the city would carry these figures. The number to be guessed included the last two digits in the thousands of the total quoted, and the last digit in the thousands of the balance. For example, if the Clearing House total should be 7,674,932 and the balance 372,441, the winning number would be 742. Odds, of course, were very much against the player winning. The policy business was run by the appellant on a large scale. He had collectors who were men having direct dealings with the players or bettors. They took the cash bet of the players, together with the slips showing the record of the numbers bet on and the amount, and the player would receive a duplicate slip as a receipt from the collector. The collector received 20 per cent. of his collections as compensation, which was deducted before they turned in their collections at the end of the week; they also received 5 per cent. of the money they turned in during the week. The number of collectors was very large. From time to time, over the period of years in question, the collectors were arrested and the appellant bailed them out, for it is a violation of section 974 of the New York Penal Law (Consol. Laws, c. 40) to engage in this game. It was also known that the appellant paid for bail bonds, which were very frequently forfeited, and he engaged a lawyer to represent the collectors who were arrested. As the business grew, the office of controller was created; he had charge of groups of collectors and acted as captain for the group. The controller was paid 10 per cent. of the week's receipts, one-half of which he gave to the collectors. The appellant dealt exclusively with the controllers, having no contact with the collectors or with the bettors. He had an office, which was closely guarded, and of necessity moved from time to time. As the operation proceeded every morning, the collectors, having collected their bets the night before would, before 10 o'clock, deliver the players' slips to their respective controllers, who would forward these by messenger to the appellant. It was necessary that the slips be in his of-

fice at 10:15, for the winning number would be known at 10:30. In the afternoon when the tabulation was completed, each controller was sent an adding machine tape, called a "ribbon," stating the amount received by the collector, less the 20 per cent. which he was entitled to keep for his compensation, the amount of hits, if any, the collector's players had scored, and the net amount due to the controller from the collector. The controller received a similar tape for himself, called a "boss ribbon," showing the total amount of money due from all of his collectors, for which amount he was accountable to the appellant. Each collector first deducted his own 20 per cent. of the receipts as his pay; he then paid any hits his players might have had that day, and sent the balance to the controller; the controller took the net proceeds of the collectors' daily business and forwarded them to the appellant.

The appellant had a number of bank accounts in which the moneys were deposited but this money was received by the appellant when all deductions had been made—the collectors' and controllers' compensation, all hits, and all expenses of collection. The sums were sometimes deposited in appellant's bank accounts directly; other times taken to his office by messenger where they could be used to pay salaries and expenses and to meet losses, if any, by other controllers. The net balance of the appellant's business, however, was deposited in his numerous bank accounts, and the jury could find from the testimony and by this method of doing business that the deposits represented his net income for the day's business. His accounts showed total deposits in 1928 of $233,317.85; 1929, $283,427.03; 1930, $566,409.85. As the game was played, the odds against the player were about 1,000 to 1, and the winnings paid on the basis of about 600 to 1. The appellant had a margin of $400 out of every $1,000 played.

It is established that the appellant made very substantial investments during these years, withdrawing funds therefor from his bank accounts. He purchased mortgages, stocks, and real estate; he lived extravagantly; made very large purchases of clothing and wearing apparel, and owned and operated several large automobiles of expensive makes.

■ Whether he was guilty on counts 4, 5, and 6 was properly submitted to the jury. The argument of the appellant is that a gross income of $5,000 is not established by

the proof. By the foregoing evidence, and the character of appellant's business, it was shown appellant had receipts of very considerable sums which went into his bank accounts, and it was very clear that the provisions of the statute were violated. Section 146 (b) provides that " * * * any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony. * * * "

Section 146 (a) provides that "any person required under this title to pay any tax, or required by law * * * to make a return, * * * who willfully fails to pay such tax, make such return, * * * at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor. * * * "

■ Appellant argues that the willful failure to file a return and pay the tax does not constitute an attempt to defeat and evade the tax law as provided in section 146 (b). It is for this violation that the appellant was found guilty on counts 1, 2, and 3. The appellant maintains that the word "attempt" as used in subsection b, § 146, requires an overt affirmative act on the part of the perpetrator of the offense to constitute a crime. It is said that Congress in this legislation used the word "attempt" in connection with the commission of a crime as ordinarily understood at common law. We think the violation of an obligation to pay income tax imposed by law created a new crime. Congress expressed a clear intent that all violators of the administrative provisions should be guilty of the misdemeanor as described in section 146 (a), and that those who willfully attempt to escape the substantive provisions of the law should be guilty of a felony as provided in section 146 (b). Congress intended by this legislation to punish as a felony the failure to make a return or pay taxes where income and the obligations to pay the tax were concealed. This was intended to be the highest form of crime against the revenue laws. It cannot be that Congress intended to punish more severely one who filed a return fraudulently, in part revealing that he had a business, showing his identity and his business, than one who willfully did not file, as provided in section 146 (b). The term "attempt" as used at common law involved an endeavor to accomplish an act which, if consummated, would have been a crime. "At-

tempt," as used in section 146(b), is used not only in the criminal section of the act, but also in a section relating to civil recovery of taxes. Revenue Act 1928, § 619(a), section 106, title 26 U. S. C. (26 USCA § 106). The acts penalized at common law as completed or substantive offenses are acts in themselves of an affirmative nature. At common law, few duties are imposed upon individuals requiring them to affirmatively do something, and the sanctions and penalties of the common law forbid, rather than require, an act. Substantive offenses at common law generally require affirmative action, as illustrated by the list of crimes known to the common law. Offenses of attempting to commit a crime were created obviously to provide a punishment when an offender tried to do an act and failed. They were supplementary to the crimes involved in the completed offenses. The requirements of an overt act in criminal attempts, punishable at common law, was therefore necessary, and that act was affirmative in all cases. But under the Revenue Act, creating a new system of duties and obligations, the report and payment of taxes owing to the government imposed an affirmative duty of reporting and paying the tax. The failure, by omission, to perform this statutory duty, is regarded as an offense in the statutory system for the collection of the revenue, and to be willful in that conduct incurred the criminal liability. The individual commits no overt act in the case of an attempt to defeat the income tax by willfully refraining from filing a return or paying the tax. Therefore the crime here involved has no relation to common-law attempts, but is clearly a new offense wholly "sui generis" in nature. The section does not punish one who tries and fails to commit a more serious offense. Capone v. United States, 56 F.(2d) 927 (C. C. A. 7); O'Brien v. United States, 51 F.(2d) 193 (C. C. A. 7).

■ Moreover, by the words "in any manner" in section 146(b), Congress indicates an intention to cover all possible methods of evasion; if it intended to require specific means as an exclusive method of attempting tax evasion, it is difficult to see why Congress did not set forth these means in the statute. At common law, in charging an attempt, it was necessary to allege the overt act in the indictment as an essential element of the offense. Joyce on Indictments (2d Ed.) § 482; Wharton's Criminal Procedure (10th Ed.) vol. 1, § 202. In revenue offenses, the particular means need not be alleged in the

indictment. United States v. Simmons, 96 U. S. 360, 24 L. Ed. 819. And this applies where the statutory offense charged used the word "attempt" both in the statute and in the indictment. Hardesty v. United States, 168 F. 25 (C. C. A. 6); United States v. Knoblauch (D. C.) 291 F. 407; May v. United States, 199 F. 42 (C. C. A. 8.)

There is no difficulty in punishing a guilty person for willful failure to file a tax return as a misdemeanor and punishing him for an attempt to evade the tax in that he failed to file the same return and pay the tax. The test of identity of offenses is well established, and the rule is that offenses are distinct in law whenever conviction of one requires proof of a fact not essential to a conviction under the minimum statutory requirements of the other. Albrecht v. United States, 273 U. S. 1, 47 S. Ct. 250, 71 L. Ed. 505; United States v. Noveck, 273 U. S. 202, 47 S. Ct. 341, 71 L. Ed. 610; Capone v. United States, supra; O'Brien v. United States, supra. The misdemeanor section, in the case of failure to file a return, requires that the individual must have derived a gross income of $5,000 regardless of his net income, whereas the minimum requirement of the felony section is that a tax must be due on some net income and that the defendant willfully failed to report his income and pay his tax.

It is thus apparent that Congress could not have intended that the man who fails to file any return, where a tax is due, is guilty of a lesser offense than a man who files a fraudulent return.

The purpose of subsection (a) of section 146 is to deal with the violations of administrative regulations of the taxing statute, as is indicated by the imposition of the duty to perform certain acts upon individuals required to do so by the revenue law and regulations thereunder. The misdemeanor section contains the phrase, "at the time or times required by law or regulations." This emphasis upon the time element not contained in subsection (b), § 146, shows the line of demarcation between the two sections. In subsection (a), the failure specified must be willful but there are breaches of the administrative rules less serious than the evasion of taxes, and they are subject to lesser penalties. On the other hand, the phrase of subsection (b), " * * * any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof," makes it a felony to attempt to defeat a tax which is due. This does not refer solely to individuals who are accountable for taxes collected by them from others, but refers to "any person" and "in every manner," which indicates that the provision was intended to reach every type of attempted tax evasion. A tax could neither be evaded nor attempted to be evaded if it was not due; if, by the terms of the statute, there is no tax due in a particular case, there is no "tax imposed by this act" to evade or defeat. But a failure to file a return where the gross income is over $5,000 is an offense punishable as a misdemeanor. The more serious offense of felony is reserved for those who, having a tax to pay, attempt to defeat or evade it in any manner.

We have examined the errors alleged to have been committed in the course of the trial and the proceedings which followed the jury's return for instructions. No error was committed in the reception or rejection of evidence, nor was there error committed in further instructions given to the jury. The exhortation urging the jury to reach an agreement was proper and helpful. Ammerman v. United States, 262 F. 124 (C. C. A. 8). The court's charge to the jury, as to the law governing the case, fully instructed them for their deliberations. The evidence of guilt is sufficient, and the judgment must be affirmed.

Judgment affirmed.