**FORD v. UNITED STATES.**
No. 14466.

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 1954.

Rehearing Denied March 18, 1954.

**314**

Douglas W. McGregor, Houston, Tex., William E. Stone, Galveston, Tex., for appellant.

Charles F. Herring, U. S. Atty., Thomas E. James, Asst. U. S. Atty., Austin, Tex., for appellee.

Before HUTCHESON, Chief Judge, and HOLMES and RIVES, Circuit Judges.

RIVES, Circuit Judge.

Appellant, defendant below, was charged in a three count indictment with violating Section 145(b) of Title 26, United States Code.[1] Each count charged that the defendant did willfully and knowingly attempt to defeat and evade a large part of the income tax due and owing by him and his wife by filing and causing to be filed a false and fraudulent joint income tax return on their behalf. The three counts covered the income taxes for the calender years 1945, 1946 and 1947, respectively, and charged the following discrepancies: for 1945, income returned $3,600, actual net income $6,321.83, tax returned $220, tax due $784; for 1946, income returned $3,700, actual net income $6,086.04, tax returned $66, tax due $464; for 1947, income returned $1,507.10, actual net income $29,988.26, tax returned none, tax due $7,476.75.

The jury found the defendant guilty on all three counts of the indictment, and the Court imposed a single sentence of imprisonment for a term of four years. This appeal followed.

■ It is first insisted that the Court erred in denying defendant's motion for a directed verdict of acquittal because of the alleged insufficiency of the evidence. It is of course clear that the offense punishable under the statute, Section 145 (b) of Title 26, United States Code (footnote 1, supra), relates not only to the defendant's own income tax, but also to that due and owing by others, including the tax on the joint or community income of himself and his wife. See United States v. Johnson, 319 U.S. 503, 518, 63 S.Ct. 1233, 87 L.Ed. 1546; O'Brien v. United States, 7 Cir., 51 F.2d 193, 197; Levin v. United States, 9 Cir., 5 F.2d 598, 603.

■ The Government's case was presented by the cash receipts and ex-

1. "Section 145. Penalties
"(b) Failure to collect and pay over tax, or attempt to defeat or evade tax. Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

penditures method of proving unreported income. See United States v. Johnson, 319 U.S. 503, 517, 63 S.Ct. 1233, 87 L.Ed. 1546; United States v. Caserta, 3 Cir., 199 F.2d 905, 907, a variation of the net worth and disbursement method employed in such recent cases decided by this Court as Pollock v. United States, 5 Cir., 202 F.2d 281; Wardlaw v. United States, 5 Cir., 203 F.2d 884; Montgomery v. United States, 5 Cir., 203 F.2d 887; and Sasser v. United States, 5 Cir., 1953, 208 F.2d 535. One of the most difficult matters of proof in such cases is to establish a satisfactory starting point at the beginning of the first of the tax periods included in the indictment, that is as applied to the present case, to negative the existence on January 1, 1945, of resources available to the defendant and his wife from which the excessive expenditures might have come. The Government then has the further burden in such cases of proving that there were no gifts, devices, or other nontaxable income which could have been used for the expenditures, and of proving large cash expenditures within each of the tax years considerably exceeding the taxpayer's accumulated cash resources plus reported income and which expenditures could not be otherwise accounted for than by finding that the taxpayer had received more taxable income than had been reported, and had willfully and knowingly filed or caused to be filed a false and fraudulent income tax return. Proving the receipt of taxable income from increase of net worth or from expenditures or from a combination of the two is really the use of circumstantial evidence which must be sufficient to exclude in the minds of the jury every reasonable hypothesis other than guilt of the defendant. Pollock v. United States, supra; Remmer v. United States, 9 Cir., 205 F.2d 277, 281, 288.

The Government introduced some forty witnesses who testified without contradiction as to the expenditures during the years covered by the indictment, and showed the total cash expenditures for 1945 to be $6,287.55, for 1946, $6,148.58, and for 1947, $45,487.67, or an aggregate for the three years of $57,923.80.[2] The total income returned during the same three years was only $8,807.10, leaving an excess in expenditures of $49,016.70 (exclusive of the items mentioned in footnote 2, supra) which necessarily came either from prior accumulations, from nontaxable receipts, or from taxable income.

To show how much of the expenditures could have been made from prior accumulations and from nontaxable receipts, the Special Agents of the Bureau of Internal Revenue made a thorough investigation, and also interrogated the defendant with his consent on several different occasions. All of the banks in Galveston were contacted to ascertain whether the defendant, his wife, or any of his children had since the year 1925 maintained a checking account, a savings account or a safety deposit box. No checking account or safety deposit box was discovered, and the defendant stated to the agents that he had never maintained a checking account anywhere and had never had a safety deposit box. He had had two small savings accounts, one showing a balance on January 1, 1945 of $1.73, and the other a balance of $193.50 on that date. He had made some small loans which had been paid in some instances and renewed in others.

The County court records were checked for the ownership of property and for sales of real estate. The defendant owned the home purchased in 1929 for $2,000. He was asked by the agents whether or not he owned any other real property and he said that he did not. He was also asked if all of the property that he owned was in his name or in his wife's name, and whether or not it had been recorded, and he replied in the affirmative.

---

**2.** And that sum does not include such expenditures as were made for groceries, gasoline and drugs for a family of five people, those items not being covered by the witnesses produced.

The probate court records were checked for any inheritances of the defendant or his wife and none were found. The defendant told the agents that he had never received any inheritance and that *"as far as he knew"* his wife had not. The various insurance agencies in Galveston were checked as to life insurance policies with negative results confirmed by the defendant, and the same was true as to stockbrokers' accounts in Galveston and in Houston. The defendant told the agents that he had never received any gifts of money, and that his wife had not received any *"as far as he knew"*.

The defendant told the agents that his wife was not employed during the years 1945, 1946, or 1947, and in fact had not been employed since the year 1925. The defendant was appointed as a patrolman in the Police Department of Galveston, Texas on May 27, 1925, and continued in the police department until May 22, 1947. His salary remained at $120 per month from the time of his appointment through 1932; from that time through January of 1940 he received $135 per month; during 1940 and a part of 1941 he received $200 per month; in August of 1941 he became Chief of Police and began receiving $300 per month which continued until the latter part of 1946; and from then until his services were terminated on May 22, 1947 he received $320 per month.

The defendant admitted to the agents the existence and operation in Galveston of several gambling houses and of several houses of prostitution, but denied that he had ever received "pay-offs" from any of them. He told the agents that he did not gamble until he got off the police force, but after he got off the police force that he did gamble and that

he had won money and had a net gambling gain of about $1,000 in the year 1947. Excluding any gains from gambling or other illegal pursuits, the agents were able to trace funds available for expenditures as follows: for 1945 $3,664.07, for 1946 $3,713.53, for 1947 $16,230.52, or a total of $23,608.12, leaving unaccounted for at least $34,315.68 spent during the three years.

These figures did not take into account $12,000 which the defendant told the agents he had in 1944 in a chifforobe drawer because the agents said that he made conflicting statements, that he had also said that "he had two or three thousand dollars in 1947, and that he also had two or three thousand dollars in 1945, and therefore there was no gain or loss, and therefore it has no bearing on the computation at all." The defendant's claim that he had on hand $12,000 in 1944 was before the jury for its consideration, and the agents explained why they omitted the alleged cash on hand in computing the funds available for expenditure. See Brodella v. United States, 6 Cir., 184 F.2d 823.

■■ The appellant strongly insists that there was not sufficient evidence as to the income of his wife, her net worth, inheritances, and receipt of gifts or bequests. As has been stated, none such were revealed by the agents' investigations, the wife had been continuously unemployed and the defendant told the agents that she had received no gifts or inheritances "as far as he knew". Neither the defendant nor his wife took the stand and the only witnesses offered in his behalf were three character witnesses. The district court charged the jury that the failure of the defendant to testify in his own behalf must not be considered as any evidence of his guilt.[3]

---

3. As being in accord with Section 3481 of Title 18, United States Code, see Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257; Compare, however, the possible contrary indications in Barrow v. United States, 5 Cir., 171 F.2d 286; Guzik v. United States, 7 Cir., 54 F.2d 618; United States v. Zimmerman, 7 Cir., 108 F.2d 370; Malone v. United States, 7 Cir., 94 F.2d 281; United States v. Hornstein, 7 Cir., 176 F.2d 217; Bell v. United States, 4 Cir., 185 F.2d 302; Rossi v. United States, 289 U.S. 89, 53 S.Ct. 532, 77 L.Ed. 1051; and the dissent in Bryan v. United States, 5 Cir., 175 F.2d 223, 227, 228, 229.

As to the testimony of the wife, however, the rule is different. The wife is now a competent witness in behalf of her husband, Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, though ordinarily not against him, see Pereira v. United States, 1954, 74 S.Ct. 358. "The rule, even in criminal cases, is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021. See, also, Billeci v. United States, 87 U.S. App.D.C. 274, 184 F.2d 394, 398, 24 A.L.R.2d 881; 20 Am.Jur., Evidence, Sec. 187; 2 Wigmore on Evidence, 3rd ed., Sec. 290, p. 176; Sec. 285, pp. 165, 166.

■ We think that the evidence was sufficient for the jury's consideration and that the Court properly denied the defendant's motion for a directed verdict of acquittal.

■ The appellant next insists that the Court erred in admitting in evidence purchases made by the wife of defendant as evidence of expenditures and in refusing defendant's request to charge that "no such purchases shall be considered for the determination of taxable income to the defendant, Fred M. Ford." The argument is that the admission in evidence of her purchases made the wife a witness against her husband. That argument is no more sound than would be the contention that the admission of defendant's own expenditures made him a witness against himself. Evidence of expenditures, whether by the husband or by the wife, was simply evidence of acts, circumstantial evidence tending to show the receipt of income. Where there is a joint property interest between the husband and the wife, or where the wife acted, for the matter in hand, as agent of the husband, her acts are admissible against him as against any other principal or owner, the reason being well expressed by Professor Wigmore, "for not only is

the privilege against a wife's testimony not violated (since the person here has a double capacity), but otherwise the husband could always shield himself from liability whenever he chose to make his wife an agent to transact business." 3 Wigmore on Evidence (3rd. ed.), Sec. 2232, pp. 236, 237.

The appellant next insists that the Court erred in admitting the testimony of Margaret Lera, who had operated a house of prostitution in Galveston since 1941. Over the defendant's objection, she testified that in 1943 she left $100 in cash "at the defendant's office", that starting the latter part of 1945 and continuing through May of 1947 she made regular payoffs "to the police department" of $100 per month. The nearest she came to connecting the defendant with the payoffs was by a conversation in 1949 when she testified that defendant requested her aid in a political campaign on the ground as stated by him that "he had been good to me through the years." The defendant moved that her entire testimony be stricken as having no probative value. There was no sufficient proof that the defendant received the payoffs or any part of them, and a conclusion to that effect cannot be permitted to be based upon mere conjecture or suspicion. We have previously had occasion to comment on the necessity for safeguarding a defendant against the prejudice and danger inherent in this type of testimony. Montgomery v. United States, supra, 203 F.2d at page 891. The Government insists that the testimony was relevant on the question of willful intent and to show a possible source of income, citing United States v. Skidmore, 7 Cir., 123 F.2d 604, 608; Tinkoff v. United States, 7 Cir., 86 F.2d 868; and United States v. Sullivan, 2 Cir., 98 F.2d 79. None of those cases would justify the admission in evidence of this vague kind of testimony to point the finger of suspicion at the defendant as the perpetrator of a different criminal offense and one involving moral turpitude.

 The evidence sufficiently disclosed that in the defendant's office of Chief of Police he had opportunities of receiving income from graft, payoffs, or other illegal sources. There can, of course, be no presumption that the defendant was guilty of such gross misconduct as to be the recipient of such ill gotten gains. The presumption is to the contrary. It was nevertheless within the jury's province to say whether that presumption had been overcome, or to infer that the defendant had some other source of income, from the testimony that the expenditures so far exceeded the available resources disclosed by the evidence, and from the evidence that such expenditures could not be accounted for by accumulated assets or by nontaxable receipts. But to undertake to aid the jury in this function by the admission of testimony of this woman as to payoffs with which the defendant was not shown to be connected was both erroneous and highly prejudicial.

 Lastly, the appellant insists that the Court erred in unduly restricting the cross-examination of the special agent of the Bureau of Internal Revenue upon whose testimony the Government relied to establish the resources available to the defendant and his wife as of January 1, 1945. Upon such cross-examination, the following questions were asked and rulings made:

"Q. And is that the only report that has been written on this case? A. What do you mean?

"Q. Well, is that the only report that has been written on this investigation?

"Mr. James: Your Honor, I am going to object to that question, because I do not see the materiality about how many reports have been written on it.

"The Court: Suppose that you come up here, Mr. McGregor.

"(Whereupon counsel for the defendant and counsel for the government have a conference with the court at the bench, outside of the hearing of the jury and the reporter)..

"(After the conference at the bench, the following proceedings were had in open court:)

"The Court: That objection is sustained.

"Mr. McGregor: Maybe your Honor had better hear the next question that I am going to ask him because it will follow right along, if you don't want to handle it that way.

"The Court: All right. Bring your book up, Mr. Sanders (the reporter).

"(Thereupon at the bench outside of the hearing of the jury the following proceedings were had).

"Mr. McGregor: I intend to ask this witness if he does not know of his own knowledge that notice of a deficiency was issued in the year of 1944 asserting additional income in the amount of $27,600, or asserting a total income in the amount of $27,600, and the purpose of the offering of such proof would be to show cash funds available for expenditures outlined in the proof here, where there is an absence of any evidence of the receipt of cash funds in the bill of particulars, as furnished.

"The Court: Is that objected to?

"Mr. Herring: Yes, sir.

"The Court: Objection sustained.

"Mr. McGregor: Beg pardon?

"The Court: Objection sustained.

"Mr. McGregor: What was the objection?

"Mr. Herring: We object because the court has excluded any evidence going to expenditures in years prior to this matter.

"Mr. McGregor: You mean you—

"The Court: There is no necessity to argue anything, gentlemen; I have already sustained the objection. Any further questions?

"Mr. McGregor: Well, not that I think of now; I will get around to some others later. Note our exception."

We think that the testimony sought to be elicited was relevant for the purpose stated by defendant's counsel, "to show cash funds available for expenditures". Receipt of income in 1944 might go to establish resources available at the beginning of 1945, and to rebut the inferences to be drawn from the witness' direct testimony. Clearly, we think the defendant's right of cross-examination of this witness was improperly restricted, if not summarily denied. See Johnson v. United States, 318 U.S. 189, 196, 63 S.Ct. 549, 87 L.Ed. 704; Alford v. United States, 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624.

For the erroneous rulings upon the evidence which we have discussed, the judgment must be reversed and the cause remanded for a new trial.

Reversed and remanded.